**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY M., <br><br> Plaintiff, <br><br> v. <br><br> Kilolo KIJAKAZI, Acting Commissioner of Social Security, <br><br> Defendant. | Case No.: 20-cv-1457-AGS <br><br> **ORDER ON SUMMARY-JUDGMENT MOTION (ECF 10)** |

Social Security disability claimants are entitled to a fair administrative process. But not necessarily a perfect one. Although the Social Security Administration made minor missteps here in reviewing plaintiff's claim, none warrant reversal.

## BACKGROUND

The Social Security Administration, after initial review and reconsideration by social-security doctors and adjudicators, rejected plaintiff Mary M.'s application for disability benefits. (AR 109, 124.) Then Mary had a hearing before an Administrative Law Judge. (AR 13.) The ALJ found that Mary had severe depression, anxiety, and lumbar spine changes. (AR 16.) But the ALJ concluded that Mary could still work, including as a cleaner, stores laborer, and linen room attendant. (AR 25.)

To support that conclusion, the ALJ reasoned that Mary could perform medium-exertion work with some postural limitations. (AR 19.) Due to Mary's mental-health impairments, the ALJ also restricted Mary to "noncomplex tasks," "goal[-]oriented tasks," and "simple work-related decisions" with no "tasks that require a fast[-]paced production quota" or "public contact." (*Id.*)

Mary appeals the ALJ's decision. She argues that the ALJ mishandled the restrictions imposed by her mental-health impairments, failed to consider her husband's

statements about her condition, and relied on jobs that lack sufficient numbers in the national economy. (*See generally* ECF 10.)

## DISCUSSION

### A.    Residual Functional Capacity: Mental-Health Limitations

As part of the disability determination, an ALJ must often determine a claimant's residual functional capacity, which is the most a claimant can do on a sustained basis. *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P, 1996 WL 374184. Mary argues that the ALJ failed to appropriately incorporate her mental-health limitations in her residual functional capacity. Specifically, Mary asserts that the ALJ failed to adequately consider two medical opinions in the record and even failed to incorporate the ALJ's own findings concerning Mary's mental health.

#### 1.   *Medical-Opinion Evidence*

##### a.   *The Evolving Law on Medical-Opinion Evidence*

For decades, the Social Security Administration considered medical opinions under what became known as the "treating-physician rule," *see* 20 C.F.R. 404.1527, and interpretations of that regulation led to a large body of case law. *See, e.g.*, *Trevizo v. Berryhill*, 871 F.3d 664, 675-77 (9th Cir. 2017); *Arakas v. Comm'r of Soc. Sec.*, 983 F.3d 83 (4th Cir. 2020); *Jones v. Astrue*, 647 F.3d 350 (D.C. Cir. 2011); *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 (6th Cir. 2005); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625 (10th Cir. 2003); *Hackett v. Barnhart*, 395 F.3d 1168 (10th Cir. 2005); *Leggett v. Chater*, 67 F.3d 558 (5th Cir. 1995). But for claims filed after March 2017, like this one, that regulation was replaced with 20 C.F.R. § 404.1520c. The new regulation streamlined the consideration of medical opinions, removing the old rule's medical-provider hierarchy and increasing ALJ discretion by cutting down the number of considered factors.

So, the Court is limited to the familiar and forgiving review that the ALJ may not abuse that discretion. *See Smith v. Berryhill*, 139 S. Ct. 1765, 1779 (2019) ("[T]he standard of review [is an] abuse of discretion as to the overall conclusion, and 'substantial evidence' 'as to any fact.'" (quoting 42 U.S.C. § 405(g)). ALJs abuse their discretion when they fail

to (1) "consider" the medical-opinion evidence as required by regulation; (2) "articulate" specific and legitimate reasons—particularly the consistency and supportability of the opinion—for the persuasiveness of the opinion; or (3) support those reasons with "substantial evidence" from the record. *See* 20 C.F.R. 404.1520c(a) ("[W]e will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed . . . ."); 20 C.F.R. 404.1520c(b) ("We will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in your case record."); 20 C.F.R. 404.1520c(b)(2) ("The factors of supportability . . . and consistency . . . are the most important factors. . . . We may, but are not required to, explain how we considered the [other] factors . . . ."); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

      b. *Dr. Durr's Examination*

Due to her mental-health claims, the Social Security Administration sent Mary to see clinical psychologist Dr. Jessica Durr for a one-time evaluation. The ALJ found Dr. Durr's opinions "somewhat persuasive," accepting most of Dr. Durr's recommendations and rejecting one. (AR 23.) Mary complains that the ALJ failed to include the memory problems mentioned in Dr. Durr's opinions in her residual functional capacity.

Not so. Far from failing to reasonably consider Dr. Durr's opinion concerning memory deficits, the ALJ instead adopted it wholesale into the residual functional capacity. Dr. Durr, in her mental-status examination, mentioned that Mary had some memory concerns: "She was able to recall 3 out of 3 objects immediately and 1 out of 3 objects at 5 minutes. She was able to recall what she had for breakfast. She was able to recall her date of birth." (AR 439.) When explaining the results of that data, though, Dr. Durr said that Mary had "a mild inability to understand, *remember*[,] and carry out detailed instructions," but could "*remember* and carry out short, simplistic instructions without difficulty." (AR 440 (emphasis added).) The ALJ adopted the limitation Dr. Durr recommended based on Mary's memory deficits, specifically finding Mary "limited" to "noncomplex tasks."

(AR 22; *see also id.* ("These limitations are supported by the claimant's ongoing anxiety and depressive symptoms coupled with her mental status examination at a consultative examination . . . .").) Since the ALJ adopted Dr. Durr's recommended limitations because of Mary's memory problems, Mary's argument that the ALJ failed to consider Dr. Durr's memory-deficit findings is meritless.

      c. *Nurse Practitioner Harwood's Opinion*

Next, Mary argues the ALJ failed to adequately wrestle with the opinions of Nurse Practitioner Paula Harwood, who treated Mary for her mental-health symptoms. Harwood opined to greater memory restrictions than the ALJ ultimately adopted, including: "P[atien]t would not be able to remember and sustain work day procedures"; "She would struggle to understand and carry out simple instructions with efficiency"; "Memory is erratic and inconsistent"; "She cannot process information easily or perform tasks that require critical thinking"; "She cannot remember detailed instructions, process, or carry out instructions easily." (AR 448-49.) Harwood also rated Mary as "Unable to meet competitive standards"—the second-highest restriction—in nearly every avenue of mental ability or aptitude to work. (*See* AR 447-49.) She opined that Mary had a "Marked" limitation—again, the second-most extreme restriction—in every area asked about: understanding, remembering, and applying information; interacting with others; concentration; persistence; maintaining pace; and adapting/managing in the workplace. (AR 450.) Finally, Harwood opined that Mary would miss "[m]ore than four days per month" from work due to her mental health. (AR 451.)

The ALJ found Harwood's opinion unpersuasive because it "is not supported by any contemporaneous treatment notes or objective findings," "was authored over one year after the last date insured," and was "inconsistent with [Mary's] unremarkable mental status examinations throughout the treatment record." (AR 24.) Mary fails to address—and thus concedes—that the opinion was authored a year after her date last insured. (*See* ECF 10, at 15.) Under the old standard, the Ninth Circuit held that "medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the

preexpiration condition." *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995). It's unclear whether an opinion's late vintage can still be a specific and legitimate reason for discounting that opinion under the new regulations.[1] It doesn't matter, though, as the ALJ's other reasons are more than sufficient. *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (holding an "ALJ's error was harmless where the ALJ provided one or more invalid reasons" to reject testimony or an opinion, "but also provided valid reasons that were supported by the record.").

The ALJ correctly noted that Harwood's opinion is not supported by contemporaneous medical records. On May 6, 2019, Harwood examined Mary and then wrote her opinion that same day. (*See* AR 452-56.) Her examination notes do not suggest anything like the extreme limitations in her opinion. Although Harwood diagnosed Mary with "[m]ajor depressive disorder, recurrent, moderate" and found "mild" judgment impairment along with impairment in "concentration" and "memory," she also noted that Mary "is reasonably well managed on current meds" and had a GAF score of 62.[2] (AR 452,

---

[1] The Court believes that considering a medical opinion's date is not an abuse of discretion. Under the new regulations, the ALJ must simply explain how "persuasive" an opinion is. *See* 20 C.F.R. 404.1520c. In determining an opinion's persuasiveness, an ALJ can properly consider whether the opinion was written during the alleged disability period or well after it. Even under the old standard, which was far less flexible, opinions written long after the disability period were considered "relevant." *See Lester*, 81 F.3d at 832.

[2] The Global Assessment of Functioning is a 100-point mental-health scale for rating a patient's social, occupational, and psychological functioning, with 100 being the highest functioning and 1 the least. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 (10th Cir. 2012) (citation omitted). A series of GAF ranges that can be compared to Mary's 62-65 GAF scores have been included:

- **61-70: "Some mild symptoms** (e.g., depressed mood and mild insomnia), **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

454-55.) The ALJ reasonably concluded that the contemporaneous record stood in contrast to the more extreme opinion penned later that day. *See Molina*, 674 F.3d at 1111 ("[W]hen the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record.").

And the record also bears out the ALJ's conclusion that Harwood's opinion contrasted with the "unremarkable mental status examinations throughout the treatment record." (*See* AR 24.) For example, Harwood's other mental-health examinations, which are the most thorough in the record, are just as unremarkable as the May 2019 examination:

| Date | AR | Mental Status Exam | Other Notes |
|---|---|---|---|
| 11/13/2018 | 457-61 | "Normal," "Average," "Within normal limits," "Unremarkable," or the like for 20 applicable categories. | "well managed on current meds"; "presents as well adjusted, capable, cooperative" |
| 6/26/2018 | 463-65 | Similarly normal on 21 categories, except "mood is anxious," "[j]udgment is fair," and "[i]nsight is fair." | "occasionally gets anxious, feels a bit tense but it is manageable"; "managing well, she is able to think clearly, concentrate and focus"; "manages daily life stressors" |
| 2/14/2018 | 468-70 | Normal on all 21 categories. | "mood is stable"; "has good energy level"; "denies anxiety [symptoms] for most part"; "handling stress well"; "thinking clearly, concentration and focus are good" |

- **51-60**: "**Moderate symptoms** (e.g., flat affect and circumlocutory speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)."

- **41-50**: "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."

*Id.* (citation omitted; boldfacing added).

Mary nonetheless complains that the ALJ erred by remarking that Harwood's opinion was "not supported by any . . . objective findings." (AR 23.) Relying on *Buck v. Berryhill*, 869 F.3d 1040 (9th Cir. 2017), Mary argues that "objective findings are not required to show mental impairments." (*See* ECF 10, at 15-16 (citing *Buck*, 869 F.3d at 1049).) But *Buck* doesn't stand for that point. It holds instead that an ALJ may not reject an opinion solely because the mental-health practitioner relied in part on claimant's self-reported symptoms. *See* 869 F.3d at 1049. More specifically, even though "clinical interview[s]" and "mental status evaluation[s]" contain patient self-reports, the *Buck* Court defined both of those procedures as "objective measures." *See* 869 F.3d at 1049. And the Court concluded that it was error to reject an opinion because it was based on such "objective measures." *See id*. By contrast, the ALJ here rejected Harwood's opinion not because of client self-reporting, but because it conflicted with Harwood's own medical records and the objective record as a whole, *including* the clinical interviews and mental-status evaluations. The Ninth Circuit has upheld ALJs who rejected mental-health opinions on these same bases—lack of "objective medical data" and lack of "clinical evidence." *See Bayliss v. Bayhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

The two most important factors in determining the persuasiveness of a medical-source opinion are "consistency" and "supportability." *See* 20 C.F.R. § 404.1520c(b)(2). Based on substantial record evidence, such as the lack of contemporaneous support for Harwood's opinion and the inconsistencies with other exams, the ALJ reasonably concluded that both these factors undermined Harwood's opinion. Thus, the ALJ did not abuse her discretion.

### 2. *The ALJ's Own Mental-Health Findings*

As part of the ALJ's opinion, and before writing a residual functional capacity, an ALJ must first decide whether a claimant has a severe impairment that meets or equals a "listing." "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). "The reason

for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Id.*

When doing that review for mental-health impairments, an ALJ must review the four "paragraph B" criteria and assign each a limitation. Those four criteria are the ability to "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § 404.1520a(c)(3). Each criterion is given a rating of "[n]one, mild, moderate, marked, [or] extreme." *Id.* at (c)(4). The ALJ determined that Mary had "mild" limitations in every category except interacting with others, for which she assessed a "moderate" limitation. Mary argues that the ALJ's residual functional capacity did not incorporate any restriction based on the "mild" findings. (ECF 10, at 16-18.)

The paragraph B criteria are broad categories used at the severity and listing stages to screen out cases. But those categorical determinations are not necessarily part of the residual functional capacity determination. *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' . . . criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 . . . ."). The mental RFC determination "requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph[] B . . . .". *Id.* The "itemized" functions "include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id.* at *6; *see also* 20 C.F.R. § 404.1522(b) (listing the same as "basic work activities" an ALJ may need to review in deciding an RFC). In the mental RFC determination, the ALJ addressed each of those categories by limiting Mary to "noncomplex tasks," "simple work-related decisions," no "fast[-]paced production quota," and no "public contact," but allowing "goal[-]oriented tasks." (AR 19.) Nothing in the

regulations suggests that the ALJ is required to provide one-to-one RFC limitations based on the broad paragraph B categories used in the severity and listing steps.

*Hutton v. Astrue*, the unpublished case Mary relies on, does not suggest a different result. *See* 491 F. App'x 850, 850-51 (9th Cir. 2012). In *Hutton*, the Ninth Circuit reversed an ALJ who initially found "mild" limitations in concentration, persistence, or pace due to the claimant's PTSD, determining the claimant's "PTSD existed but was 'nonsevere.'" *See id.* at 850. But then, when deciding the RFC, the ALJ found the PTSD to be "in great doubt" and assessed *no* limitations in the claimant's RFC. *Id.* The Ninth Circuit held it was error for the ALJ to entirely change tack midstream, rejecting his own earlier finding. *Id.* at 851. In contrast, the ALJ here never disregarded her own earlier findings, imposing several RFC limitations reflecting her earlier paragraph B conclusions. At any rate, *Hutton* does not require paragraph B criteria to be automatically converted one-to-one into RFC restrictions.

Finally, even if the paragraph B criteria had to be translated to the RFC on a one-to-one basis, the ALJ arguably did so here. The mild limitation in understanding, remembering, or applying information is covered by the "noncomplex" limitation. *See Rebecca L. v. Berryhill*, No. 6:18-cv-00500-MK, 2019 WL 857561, at *5 (D. Or. Feb. 14, 2019) (affirming a "moderate" limitation in understanding, remembering, or applying by limitation to "simple routine, repetitive tasks"). The mild limitation in concentration, persistence, or maintaining pace is captured by both the "noncomplex" and no "fast[-]paced production quota" limitations. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173-74 (9th Cir. 2008) (affirming a "moderate" limitation in concentration, persistence, or pace by limiting claimant to "simple" work). And the mild limitation in adapting or managing herself is addressed by limiting her to "simple work-related decisions," no "fast[-]paced production quota," "noncomplex tasks," and "no public contact." *See Stevens v. Comm'r of Soc. Sec.*, No. 1:18-CV-1082-JLT, 2020 WL 1324497, at *11 (E.D. Cal. Mar. 20, 2020) ("The ALJ included limitations to 'simple and routine tasks,' 'low-stress work,' 'a relaxed production pace,' and 'occasional interaction with supervisors and brief and superficial

interaction with coworkers and the public.' . . . Courts have determined that restrictions such as those identified by the ALJ in the RFC—limiting a claimant to simple, routine tasks with limitations on interactions with coworkers and the public—are consistent with 'marked' limitations in adaption . . . .").

So, however the cake is cut, the ALJ did not abuse her discretion in handling Mary's mental-health RFC.

## B. Charles's Statement

The ALJ concluded that Mary's husband Charles's "observations and statements" in support of Mary's disability application "have the same lack of support and consistency problems as [Mary's] allegations." (AR 24; *see also* AR 232-39.) Mary argues that this was an insufficient basis to reject his statement.

Under the new regulations, Charles's statement is a "nonmedical source." *See* 20 C.F.R. § 404.1513 ("Evidence from nonmedical sources is any information or statement(s) from a nonmedical source (including you) about any issue in your claim."); 20 C.F.R. § 404.1502 ("Nonmedical source[s] include[] . . . [f]amily members . . . ."). An ALJ is "not required to articulate how [she] considered evidence from nonmedical sources using the requirements [for medical sources]." 20 C.F.R. § 404.1520c(d). The district courts have split whether, considering these new regulations, an ALJ needs to articulate *any* reason at all. *Compare Cody T. v. Saul*, No. 3:20-CV-00310-AC, 2021 WL 2660088, at *13 (D. Or. June 28, 2021) ("The amended regulations, however, do not eliminate the need for the ALJ to articulate his assessment of the lay-witness statements." (citation omitted)), *with Dubord v. Comm'r of Soc. Sec.,* No. 2:20-CV-634-KJM-KJN, 2021 WL 2661879, at *11 (E.D. Cal. June 29, 2021) ("[T]hese new regulations plainly allow for the ALJ to resolve plaintiff's case without articulating findings [on] plaintiff's sister's statement.").

The Court has been unable to locate any requirement in the current regulations that ALJs articulate their reasoning for rejecting nonmedical-source testimony. This is particularly glaring because the old regulations that were replaced in 2017 *did* have such

an explicit requirement. *See* 20 C.F.R. 404.1527(f)(2) ("The adjudicator generally should explain the weight given to opinions from these [nonmedical] sources . . . ."). In specifically omitting that requirement in the new regulations, the most natural conclusion is that the Administration sought to relieve the ALJs of that obligation. *Cf. Dupont Circle Citizen's Ass'n v. D.C. Zoning Comm'n*, 343 A.2d 296, 317 (D.C. 1975) (Reilly, C.J., dissenting) ("Under well established canons of construction, when a legislative body enacts an amendment in the nature of a substitute to a particular statute but omits an exemption contained in the original statute, such omission is presumed to be deliberate."). Instead, the regulations only generally require that the ALJ "consider all of the evidence presented," including "nonmedical sources," when weighing symptom testimony. *See* 20 C.F.R. § 404.1529(c)(3).

The Court concludes that ALJs are not required to articulate specific reasons for their findings about the persuasiveness of nonmedical-source testimony, and instead must merely show that they considered such evidence in deciding the claim. *See Jerri F. v. Kijakazi*, No. 1:20-4037-RMG-SVH, 2021 WL 3362227, at *13-14 (D.S.C. July 29, 2021) (contrasting the approaches taken by various courts and concluding that an ALJ's "failure to address the lay witness statements" at all "renders his decision unsupported by substantial evidence"). The ALJ here specifically mentioned Charles's statement and clearly considered it in her decision (*see* AR 24), and so she fulfilled her obligations.

But even if the ALJ was required to provide "germane" reasons—as ALJs had to under the old regulations—the ALJ's opinion would survive review. *See Molina*, 674 F.3d at 1111. Under the old regulations, after all, an ALJ could disregard a nonmedical source's statements when the "testimony was similar to [claimant's] complaints" and the ALJ had already rejected the claimant's testimony. *See Valentine v. Comm'r of Soc. Sec.*, 574 F.3d 685, 694 (9th Cir. 2009) (holding that when the wife's "testimony was similar to [claimant's] complaints" and the ALJ properly rejected claimant's testimony, "it follows that the ALJ also gave germane reasons for rejecting [the wife's] testimony"); *see also Molina*, 674 F.3d at 1122 (finding an ALJ's failure to address a nonmedical source *at all*

harmless in those circumstances). That is exactly what happened here. The ALJ discredited Charles's statement because it had "the same lack of support and consistency problems as [Mary's] allegations." (*See* AR 24.) Their statements were in fact very similar,[3] and Mary does not contest the ALJ's rejection of her own testimony. (*See generally* ECF 10.) Thus, the ALJ's treatment of Charles's statement was proper under any standard.

## C.   Jobs in the National Economy

Mary argues that the ALJ made two mistakes in determining that there were jobs "that existed in significant numbers in the national economy that the claimant could have performed." (AR 25.) Specifically, Mary contends that (1) she didn't meet the reasoning or mathematics requirements of a Linen Room Attendant, and, regardless, (2) the identified jobs are insufficiently numerous to meet the necessary threshold.

### 1.   *Linen Room Attendant*

The ALJ "has the burden 'to identify specific jobs existing in substantial numbers in the national economy that [a] claimant can perform despite [her] identified limitations.'" *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir. 2015) (citation omitted). To that end, the

---

[3] In Mary's testimony and Charles's sworn statement, they both offered similar outlooks on Mary's: limited ability to do chores, anxiety in public, trouble with sleeping, need for grocery-shopping assistance, inability to help with more than simple meals, driving capability, and TV-watching habits. (*See* AR 63 (Mary's testimony: "vacuum and dust and things like that"); AR 234 (Charles's statement: "Some indoor chores – wash, dishes nothing outside."); AR 65 (Mary: "I have a hard time with the public"); AR 238 (Charles: "Always fearful in public."); AR 67 (Mary: "I don't sleep."); AR 233 (Charles: "Some nights only 1 or 2 hours [sleep] total, very tired next day."); AR 69 (Mary: "When my husband and I will go. I will go with him [to shop]."); AR 235 (Charles: "I usually go with her to help [shop]."); AR 63 (Mary: "My husband makes dinner and we just have, you know, frozen dinner or light cereal or something. And I'll try to help with dinner . . . ."); AR 234 (Charles: prepares "mostly snack[s] – cer[e]als, sweets, yog[urt]," "she just doesn't cook like when she felt better"); AR 69 (Mary's testimony: Q: "Do you drive?" A: "Yes."); AR 235 (Charles: checking the "Yes" answer to "Does the disabled person drive?"); AR 68 (Mary: "Sit on the couch, maybe watch TV"); AR 236 (Charles: "TV every day, newspaper sometimes").)

ALJ looks to the Department of Labor's *Dictionary of Occupational Titles*, which sets forth the physical and educational prerequisites for various jobs. *Id*. at 846.

When a vocational expert testifies that a claimant "can perform an occupation involving [*Dictionary*] requirements that appear more than the claimant can handle," the ALJ must "reconcile the inconsistency." *Zavalin*, 778 F.3d at 846. "For a difference between an expert's testimony and the *Dictionary's* listings to be fairly characterized as a conflict, it must be obvious or apparent." *Gutierrez v. Colvin*, 844 F.3d 804, 808 (9th Cir. 2016).

According to the *Dictionary*, Linen Room Attendant requires Reasoning level 3 and Math level 2. *See Dictionary of Occupational Titles* § 222.387-030, 1991 WL 672098. Reasoning level 3 is the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations." *See Dictionary of Occupational Titles*, Appendix C, 1991 WL 688702. Courts "have found an apparent conflict" between a limitation to "simple or non-complex work and the demands of Level 3 reasoning." *Valenzuela v. Saul*, No. 1:18-CV-00295-BAM, 2019 WL 4138665, at *4 (E.D. Cal. Aug. 30, 2019). Yet the ALJ here limited Mary to "noncomplex tasks" and "simple work-related decisions" (AR 19)—determinations that are incompatible with Reasoning level 3. Since the ALJ failed to reconcile this apparent conflict, she erred by including the Linen Room Attendant job in her analysis.

Likewise, the ALJ erred in failing to reconcile the Math level 2 requirement with Mary's capabilities. Math level 2 requires the ability to, among other things, "[a]dd, subtract, multiply, and divide all units of measure." *See Dictionary of Occupational Titles*, Appendix C, 1991 WL 688702. Yet Mary could not list her "serial sevens or threes"—in other words, stating in a series 3, 6, 9, 12, etc. or 7, 14, 21, 28, etc. (*See* AR 23.) The ALJ adopted and based part of her determination on this fact. (*Id.*) Other than noting Mary's high-school education level (*see* AR 24), the ALJ did not further discuss Mary's mathematical capabilities or in any other way attempt to resolve the apparent conflict

between her mathematical limitations and a Math level 2 job requirement. The Commissioner apparently concedes this point, as she fails to address it in her response. (*See* ECF 13, at 11-12); *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (holding that a Social Security "issue is waived" if not raised in briefing before the district court).

### 2. *Significant Numbers in the National Economy*

But this error was harmless, as there are still 26,120 jobs nationally that Mary can perform. *See Molina*, 674 F.3d at 1115 (holding that a court may not reverse an ALJ unless an error was "consequential to the ultimate nondisability determination"). That is, Mary fails to challenge two other jobs that the ALJ identified for her: Cleaner and Stores Laborer (with 7,190 and 18,930 jobs nationally, respectively). (*See* AR 25.)

Mary first argues that those are insufficient by claiming that the Court must look at each individually. (*See* ECF 10, at 12.) But the regulations make it clear that the ALJ is supposed to consider the total number, rather than each identified job separately. *See* 20 C.F.R. § 404.1566(b) ("Work exists in the national economy when there is a significant number of jobs (*in one or more occupations*) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." (emphasis added)).

Mary next argues that 26,120 national jobs are insufficient because that number is very similar to the 25,000 national jobs the Ninth Circuit considered a "close call." *See Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) ("Under our current case law, the ALJ's finding that 25,000 national jobs is sufficient presents a close call."). But the holding of that opinion made clear that 25,000 national jobs *is* ultimately significant. *Id.* ("A finding of 25,000 jobs likely does not fall into the category of isolated jobs existing in very limited numbers. Accordingly, the ALJ's national job finding satisfies [the Social Security statute], because it represents a significant number of jobs in several regions of the country." (quotation marks omitted)).

So, there are sufficient jobs available in the national economy, based solely on the combined Cleaner and Stores Laborer job numbers. The erroneous inclusion of the Linen

Room Attendant job statistics was not "consequential to the ultimate nondisability determination." *See Molina*, 674 F.3d at 1115.

## CONCLUSION

Thus, plaintiff Mary's summary-judgment motion is denied. The Clerk is directed to issue a judgment and close this case.

**AFFIRMED**.

Dated:  March 25, 2022

_____
Hon. Andrew G. Schopler
United States Magistrate Judge